**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**COMPETITIVE ENTERPRISE INSTITUTE,**

    **Plaintiff,**

       **v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

    **Defendant.**

**Civil Action No. 12-1617 (JEB)**

## MEMORANDUM OPINION

This Freedom of Information Act case began in controversy and ends in minutia. Alarmed by revelations that Environmental Protection Agency officials had been using secret email addresses to conduct government business, Plaintiff Competitive Enterprise Institute, a think tank dedicated to regulatory and environmental policy, filed a FOIA request seeking information related to former EPA Administrator Lisa Jackson's use of a secondary email account. EPA produced over 10,000 records in response to this request, provided two sample Vaughn indices to justify its decision to withhold some materials, and has now moved for summary judgment.

CEI opposes that Motion on multiple grounds; these run the gamut from broad claims of bureaucratic conspiracy to nitpicking over EPA's refusal to disclose the spelling of its staff's personal email addresses. It asks the Court to deny EPA summary judgment, to order the agency to reprocess all of the documents it withheld, and to require it to provide full (rather than sample) Vaughn indices. For the most part, however, CEI speaks loudly and carries a small stick. Despite the group's bold claims, the law and the record show that EPA has almost entirely

complied with its obligations under FOIA and that it is entitled to summary judgment on nearly

every count.  Still, CEI scores a few stray hits, and the Court will require EPA to polish off these

last details before it terminates the case.

## I.      Background

        This dispute arose from the news that former EPA Administrator Lisa Jackson had used a

secondary email account under the alias "Richard Windsor" to conduct official government

business.  See Senate Environment and Public Works Comm., Minority Report, A Call for

Sunshine: EPA's FOIA and Federal Records Failures Uncovered (Sept. 9, 2013) at 9, available at

http://goo.gl/KmtqJT.  It turns out that Administrator Jackson was not the only EPA official who

used an alternative email address, which has raised questions about the agency's compliance

with federal record-keeping laws as well as the completeness of its responses to certain FOIA

requests.  See id. at 8-12.

        Appropriately concerned about these disclosures, CEI filed three separate FOIA requests

on May 8, 2012, seeking information related to Jackson's secondary e-mail account.  See

Compl., ¶¶ 25-31.  Only one of those three requests is at issue in this case.[1]  That request asked

EPA to provide the following information:

> [A]ll emails sent from or to (including as "cc:' [*sic*] or "bcc:") the
> secondary email account(s) assigned to Administrator Lisa Jackson
> during the period January 20, 2009 to the date EPA processes this
> Request, which include the words "climate", "endanger" (which
> includes in e.g., "endangerment"), "coal", or "MACT" in the body,
> "Subject", "To", "From", "cc:"[,] or "bcc:" fields.

Compl., Exh. 1 (FOIA Request) at 1; Wachter Decl., ¶ 6.  In response, EPA produced 11,782

responsive documents, of which 5,084 were produced in full, 4,983 were produced in part and

---

[1] As for CEI's other two requests, the group has expressed satisfaction with EPA's response to one and has
withdrawn its opposition to EPA's Motion for Summary Judgment on the other.  See Mot., Att. 4 (Search
Declaration of Eric E. Wachter), ¶ 5; ECF No. 22 (Notice of Withdrawal of Plaintiff's Opposition to Defendant's
Motion for Partial Summary Judgment).

withheld in part, and 1,715 were withheld in full.  See ECF No. 17 (Order Permitting Sample Vaughn Index) at 1.

Ordinarily, EPA would have to justify each of its withholdings by providing CEI "with a Vaughn index [that] . . . describe[s] each withheld document, state[s] which [FOIA] exemption the agency claims for each withheld document, and explain[s] the exemption's relevance." Johnson v. Exec. Office for U.S. Att'ys, 310 F.3d 771, 774 (D.C. Cir. 2002); see also Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973).  Rather than force EPA to defend each of the thousands of withholdings at issue in this case, however, the Court ordered that the agency should sample "10% of the fully withheld documents and 1% of the partially withheld ones – i.e., 172 fully withheld documents and 50 partially withheld documents" – and then produce a Vaughn index focused on this smaller, representative collection of withholdings.  See Order Permitting Sample Vaughn Index at 1-2; see also Bonner v. Dep't of State, 928 F.2d 1148, 1151 (D.C. Cir. 1991) (approving sampling of approximately 5% of withheld documents); Meeropol v. Meese, 790 F.2d 942, 948, 956-57 (D.C. Cir. 1986) (approving sampling of approximately 1% of withheld documents).

Before EPA sampled the withheld documents, the agency's Office of General Counsel reviewed the records and found that several hundred records had been "inadvertently categorized to be withheld in full."  Wachter Decl., ¶ 14.  The documents were therefore recategorized, and, as a result, 251 were changed from "withheld in full" to "produced in part and withheld in part," and 48 were changed from "withheld in full" to "produced in full."  See id.  The agency mailed these 299 newly produced documents to CEI on August 7, 2013 – about two weeks before it filed the instant Motion.  See id., ¶ 14; ECF No. 24 (Motion for Summary Judgment) (Aug. 21, 2013). EPA's final response to CEI's FOIA request therefore comprised 5,132 documents produced in

full, 5,234 documents produced in part and withheld in part, and 1,416 documents withheld in full. <u>See</u> Wachter Decl., ¶ 15. EPA has also created two sample <u>Vaughn</u> indices describing and explaining the applicable exemptions for 10% of the fully withheld documents and 1% of the partially withheld documents. <u>See</u> Mot., Exhs. 5 & 6 (<u>Vaughn</u> Indices).

The agency now moves for summary judgment. CEI has filed a brief in opposition, which requires a momentary digression. CEI's 44-page Opposition contains no fewer than 114 footnotes, many of which are quite lengthy and substantive. At best, this practice proves highly distracting to the reader. At worst, it appears an effort to circumvent the page limitations of the Local Rules. <u>See</u> LCvR 7(e). The Court trusts that it will not receive its like in the future.

## II. Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one that would change the outcome of the litigation. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). In the event of conflicting evidence on a material issue, the Court is to construe the evidence in the light most favorable to the non-moving party. <u>See</u> <u>Sample v. Bureau of Prisons</u>, 466 F.3d 1086, 1087 (D.C. Cir. 2006). Factual assertions in the moving party's affidavits or declarations may be accepted as true unless the opposing party submits his own affidavits, declarations, or documentary evidence to the contrary. <u>Neal v. Kelly</u>, 963 F.2d 453, 456 (D.C. Cir. 1992).

"FOIA cases typically and appropriately are decided on motions for summary judgment." <u>Defenders of Wildlife v. Border Patrol</u>, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); <u>Bigwood v. U.S.</u>

Agency for Int'l Dev., 484 F. Supp. 2d 68, 73 (D.D.C. 2007).  In FOIA cases, the agency bears the ultimate burden of proof.  See U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 n.3 (1989).  The Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981).  Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'"  SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981)).

## III.    Analysis

Congress enacted FOIA in order "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  Dep't of Air Force v. Rose, 425 U.S. 352, 361 (1976) (citation omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989) (citation omitted).  The statute provides that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A).  Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds.  See 5 U.S.C. § 552(a)(3); Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 755 (1989).

"Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious," the Freedom of Information Act "expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" Reporters Comm., 489 U.S. at 755 (quoting 5 U.S.C. § 552(a)(4)(B)). "At all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure'. . . ." Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting Dep't of State v. Ray, 502 U.S. 164, 173 (1991)).

The Court will first address the adequacy of EPA's search for responsive documents, turn next to the exemptions the agency invokes to justify withholding certain documents, and finish by assessing the segregability of those documents.   In the end, the Court concludes that summary judgment for EPA is appropriate on almost every issue, although it will require the agency to produce a few last bits of information.

A.   Adequacy of EPA's Search for Records

An agency "fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" Valencia-Lucena v. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990)); see also Steinberg v. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994).  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." Weisberg v. DOJ, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

The adequacy of an agency's search for documents requested under FOIA "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." Id.  To meet its burden, the agency may submit affidavits or declarations that explain the scope and

method of its search "in reasonable detail." Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982) (per curiam). The affidavits or declarations should "set [ ] forth the search terms and the type of search performed, and aver[ ] that all files likely to contain responsive materials (if such records exist) were searched." Oglesby v. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). Absent contrary evidence, such affidavits or declarations are sufficient to show that an agency complied with FOIA. See Perry, 684 F.2d at 127. "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." Truitt, 897 F.2d at 542.

Attached to its Motion, EPA has provided the Declaration of Eric E. Wachter, Director of the Office of the Executive Secretariat within EPA's Office of the Administrator. Wachter's Declaration explains the agency's prosecution of its search as follows: CEI's FOIA request was assigned for processing to EPA's Office of the Administrator; the Office's lead FOIA coordinator contacted the EPA Administrator's staff assistants in the Immediate Office of the Administrator; those staff assistants searched Administrator Jackson's secondary e-mail account using the search terms in CEI's request; and the search resulted in the identification of 11,782 potentially responsive records. See Wachter Decl., ¶¶ 7, 10, 11.

CEI devotes several pages of its Opposition to what is essentially an *ad hominem* attack on EPA officials and Wachter. See Opp. at 4-12. The group hammers on three points, but it never specifically challenges the actual scope or method of EPA's search for records in this particular case. See Perry, 684 F.2d at 127.

First, CEI argues that EPA officials' use of secondary email accounts raises questions about the agency's compliance with FOIA and other federal record-keeping laws. While such

use may well be concerning, this argument has no connection at all to the adequacy of the agency's search here.

Second, CEI invokes the recent FOIA case of <u>Landmark Legal Foundation v. EPA</u>, No. 12-1726, 2013 WL 4083285 (D.D.C. Aug. 14, 2013), where a court in this district denied EPA summary judgment on the adequacy of its search due to the possibility that the agency had "engaged in . . . bad faith interpretation" of the plaintiff's request. <u>Id.</u> at *6. In this case, however, CEI does not allege that the agency misinterpreted its rather straightforward request for records. The search recounted in the Wachter Declaration appears fully consistent with the group's request, and CEI does not suggest otherwise.

Finally, CEI attacks EPA's recategorization of 299 records from "withheld in full" to either "withheld in part" or "produced in full," claiming that in the <u>Landmark</u> case, the court denied EPA summary judgment for having engaged in similar conduct. That argument, however, misunderstands the problem identified in <u>Landmark</u>. There, "[o]n the eve of filing a summary judgment motion, weeks after issuing its purportedly 'final' disclosures on the matter, EPA apparently determined that these disclosures were inadequate, and subsequently disclosed <u>additional records . . . which had not previously been searched</u>, and which roughly doubled the volume of total disclosures." <u>Id.</u> at *5 (emphasis added). Because EPA provided "no explanation" for this error, the court found it possible that the agency had deliberately misinterpreted the scope of the plaintiff's FOIA request, and so denied EPA summary judgment as to the adequacy of its search. <u>See id.</u> at *5-6. Here, by contrast, EPA merely recategorized records that had already been located in its initial search, rather than producing records newly uncovered. That recategorization had no connection to the adequacy of EPA's search in response to CEI's FOIA request. EPA has also provided an explanation for its miscue in this

case, which was apparently caused by a combination of technological error and a belated review of the "withheld in full" records by agency counsel.  See Reply, Att. 2 (Supplemental Declaration of Eric E. Wachter), ¶¶ 5-17.

Hazy allegations of administrative malfeasance may sound incriminating, but the Court requires concrete, specific challenges to the sufficiency of EPA's search in order to deny the agency summary judgment on this point.  CEI has failed to provide them, and so the Court finds summary judgment proper on the adequacy of the search.

B.  <u>Validity of EPA's Sample </u>Vaughn<u> Indices</u>

Another thrust of CEI's Opposition are its attacks on the validity of the sample <u>Vaughn</u> indices that EPA submitted along with its Motion for Summary Judgment.

1.  *Number of Sampled Documents*

To begin, CEI argues that EPA's sampling of <u>142</u> fully withheld documents fails to comply with this Court's order that the agency "sample 10% of the fully withheld documents . . . *i.e.*, <u>172</u> fully withheld documents."  Order Permitting Sample <u>Vaughn</u> Index at 2 (emphasis added).  Merely quoting that Order, however, is enough to undermine CEI's claim.  The Court's instruction was for EPA to sample "10% of the fully withheld documents."  The "172" figure simply served to illustrate the meaning of the preceding percentage.  Because the total number of fully withheld documents fell following the agency's belated recategorization of 299 records, it was appropriate that the total number of sampled documents would also decrease.  The sample of 142 fully withheld documents – 10% of the 1,416 fully withheld documents, <u>see</u> Wachter Decl., ¶ 15 – therefore satisfies the Court's Order.

## 2. *Violation of <u>Bonner</u>*

CEI next claims that EPA's last-minute recategorization of 299 documents initially marked as "withheld in full" violates the D.C. Circuit's decision in <u>Bonner v. Dep't of State</u>, 928 F.2d 1148 (D.C. Cir. 1991). That argument, however, once again miscomprehends the relevant precedent. In <u>Bonner</u>, the State Department had agreed to provide a sample <u>Vaughn</u> index comprising 63 out of 1,033 partially withheld records. <u>See</u> <u>Bonner</u>, 928 F.2d at 1149. After the Department created the sample, however, it determined that 19 of the selected documents could be released in full, and so the <u>Vaughn</u> index that it furnished to the plaintiff only covered 44 of the 63 sampled documents, without explaining the initial withholding of the 19 released documents. <u>See</u> <u>id.</u> at 1149-50. On appeal, the D.C. Circuit found that the release of the 19 documents – in the absence of any explanation of why they had been initially withheld – destroyed the representativeness of the selected sample. <u>See</u> <u>id.</u> at 1150-52.

The <u>Bonner</u> court explained that agencies were permitted to use representative sampling in FOIA cases because "[i]f the sample is well-chosen, a court can, with some confidence, extrapolate its conclusions from the representative sample to the larger group of withheld materials." <u>Id.</u> at 1151 (internal quotation marks omitted). The court emphasized, however, that a representative sample "will yield satisfactory results only if the sample employed is sufficiently representative [of the whole], and if the documents in the sample are treated in a consistent matter." <u>Id.</u> The Department had therefore tainted its sample index by releasing 19 of the documents contained therein, which "undermine[s] the confidence one can have that the Department correctly invoked FOIA to shield information contained in the . . . documents not described in the <u>Vaughn</u> index." <u>Id.</u>

Here, by contrast, the 299 belatedly released records were never a part of the sample Vaughn index, but rather came from the total collection of withheld documents. Only after their release did EPA take a sample of the remaining documents that it still intended to withhold. There is therefore no connection between the release of these records and the representativeness of the sample EPA has provided, and no reason to doubt that the sample accurately reflects the remainder of the documents withheld. The Bonner court itself emphasized the importance of this distinction:

> Had Bonner . . . simply requested 63 documents and received 19 without deletions, the district court would have been entirely right that, with respect to those 19, it had 'no role to play.' But the 19 documents here were part of a representative sample. They count not simply for themselves, but for presumably similar non-sample documents still withheld.

Id. at 1152 (emphasis added) (citations omitted). CEI finds itself in the former scenario. It requested 11,782 documents, received 10,067 in whole or in part, and later received an additional 299. EPA then produced a sample of the documents that it had not handed over. According to Bonner, therefore, because the 299 recategorized records were not "part of a representative sample," the Court has "no role to play" in regard to them. Id. (internal quotation marks omitted).

### 3. *Final Lists*

Finally, CEI has offered several challenges to the integrity of EPA's full lists of withheld documents, which, if correct, could impugn the validity of the Vaughn indices sampled from those lists. See Opp. at 17-21. Inferring that at least some of CEI's objections might be due to confusion between the agency's "draft" lists of withheld documents and its "final" lists (which CEI did not receive prior to filing its Opposition), compare Reply at 10-11 with Opp. at 17-21, the Court issued a Minute Order instructing EPA to file its final lists and then directing CEI to

submit a pleading informing the Court of whether it still maintained those objections.  See

Minute Order (Dec. 20, 2013).  Both parties have complied, and though CEI has abandoned

some of its arguments, it still maintains several challenges to the final lists.

First, CEI notes that some of the partially withheld documents originally listed by EPA

are unnumbered and that there is no indication that those documents were included when the

agency took its sample of every 100th partially withheld document.  EPA concedes that the 25

documents in question, see Opp. at 19-20 n.47 (listing the unnumbered documents), were

"inadvertently excluded from the sample pool," explaining that it had initially intended to release

them in full, but that at the last minute, it had identified personal information in the records that

should have been redacted under FOIA Exemption 6.  See Reply at 9; Supp. Wachter Decl., ¶¶ 7,

11.  The agency explains that the documents were edited to remove the personal information,

otherwise released in full, and then included unnumbered in the list of partially withheld

documents.  See Reply at 9; Supp. Wachter Decl., ¶¶ 7, 11.

Because this Court ordered EPA to sample every 100th redacted document, see Order

Permitting Sample Vaughn Index at 3, it is possible – indeed, probable – that even if these 25

records had been included in the full list from which that sample was taken, none of them would

have been among the ones selected.  Nevertheless, the Court's Order was clear and EPA offers

no justification for this mistake.  In order to ensure full compliance with its sampling Order,

therefore, the Court will require EPA to justify its withholding of one out of the 25 documents in

question.  To guarantee that such document is selected at random, the Court instructs that EPA

should justify its withholding of the 10th such document listed in footnote 47 of CEI's

Opposition brief (counting from the left).  See Opp. at 19 n.47.

Second, CEI observes that both the final list of fully withheld documents and the final list of partially withheld documents both begin with records numbered "-0." ECF No. 35, Exh. 1 (List of Withheld In Full Documents) at 1; ECF No. 35, Exh. 2 (List of Redacted Documents) at 1. CEI finds this numeration suspicious because the rest of the listed records have numbers beginning with the appellation "01268-EPA-" and also because the two "-0" records are out of chronological order with the other documents on the lists. According to CEI, EPA may have inserted these two extra "-0" records in order to manipulate which documents from the lists would be sampled. In other words, CEI alleges that EPA added these extra documents to the beginning of each list in order to change the sequencing of the subsequent records – the "10th" document became the "11th," the "100th" became the "101st," and so on – and thereby avoid including certain damaging records in its sample Vaughn indices.

This imaginative conspiracy theory is brought back to Earth by EPA's explanation of the "-0" records: the two "-0" documents in question did not receive tracking numbers – one because it was initially categorized to be released and the other because it was determined to be non-responsive – and "documents without a tracking number appear in the database as '-0.'" Defendant's Reply to Plaintiff's January 13, 2014, Filing at 3. That settles the strange numeration of the two records. EPA also explains that it organized the lists based on tracking number, not based on chronology, and that, as a result, the documents numbered "-0" appear first. That settles the strange ordering of the lists. For those still hungry for information about these two records – or perhaps suffering from insomnia – EPA has provided an even more in-depth explanation in an appendix attached to its most recent filing. See Defendant's Reply to Plaintiff's January 13, 2014, Filing, Appx. A (Table of "Non-Responsive" and "-0" Documents).

Next, CEI points out that four documents included in the final list of fully withheld documents were not assigned a particular FOIA exemption, but were instead labeled "non-responsive." See List of Withheld In Full Documents at 1, 26, 167. CEI argues that EPA is limited to the nine enumerated FOIA exemptions and that an agency may not justify a withholding on the ground that a document is "non-responsive." See American Immigration Council v. Dep't of Homeland Sec., 950 F. Supp. 2d 221, 248 (D.D.C. 2013). CEI also complains that it never before received any information about these non-responsive documents.

EPA explains that the four documents were labeled "non-responsive" because they "do not contain any of the keywords required by Plaintiff's request." Wachter Dec., ¶ 27; see also Table of "Non-Responsive" and "-0" Documents (explaining why each of the four documents was not responsive to CEI's request). These documents nevertheless appear on the final list because, when the agency performed the sampling ordered by the Court, it created the sample pool by using records "that had been categorized with a FOIA exemption and marked "WIF," [withheld in full] or that were not produced (*i.e.* not responsive)." Reply, Exh. 1 (Declaration of Timothy Mallon), ¶ 14 (emphasis added). The agency then included those four "non-responsive" records in its final list in order to "account for all documents initially collected, but not provided to plaintiff for any reason." Defendant's Reply to Plaintiff's January 13, 2014, Filing at 4.

While it would have been preferable for EPA to leave these non-responsive documents off its final list of fully withheld documents, the Court will not deny the agency summary judgment on this point. The exemptions enumerated in FOIA permit agencies to refuse to release information that they would otherwise be required to disclose in response to an outside request. See 5 U.S.C. § 552(a) & (b). Documents that are "non-responsive" to a FOIA request, conversely, are simply not subject to the statute's disclosure requirements, and agencies may

thus decline to release such material without invoking a statutory exemption. See 5 U.S.C. § 552(a)(3)(A) ("[E]ach agency, upon any request for records which . . . reasonably describes such records . . . shall make the records promptly available to any person."). In other words, while most FOIA cases deal with documents that are produced and then withheld under a particular exemption, non-responsive records need never be produced at all. American Immigration Council dealt with the very different scenario in which an agency had produced an apparently responsive record and then retroactively attempted to justify redacting that document by claiming that it was a "non-responsive duplicate." See American Immigration Council, 950 F. Supp. 2d at 248. In sum, although EPA, out of an abundance of caution that borders on confusion, included non-responsive documents on its final list of withheld documents, the agency was not required to release them nor further justify their withholding.

There is still a problem, however, because by including these "non-responsive" records in its sample pool, EPA risked polluting the final sample with irrelevant documents. The sampling procedure was intended to allow the Court to evaluate the propriety of EPA's claimed FOIA exemptions, and the inclusion of non-responsive documents undermines that purpose. Indeed, one of the entries on the sample index of fully withheld documents is labeled "non-responsive," see Vaughn Index – Every 10th (Withheld in Full Documents), at 83, although CEI has chosen not to object to that specific entry. Nevertheless, because the relative number of documents in question here is minuscule – four out of a total 1,420 records – because the agency has gone to great lengths to explain the situation, and because CEI has not objected to the single Vaughn entry labeled "non-responsive," the Court will not hold up the case on this relatively minor point.

Two last objections to the final lists remain. First, CEI complains that the final lists "bear[] the date December 27, 2013, well after the date of any sampling in this case, and after all

15

of the parties' briefs on summary judgment." Plaintiff's Response to Notice of Filing at 3. Second, CEI objects that EPA "has not submitted any declaration or sworn affidavit to explain when, or how, this new list was generated. The only list confirmed to exist at the time of the sampling (and [D]efendant's motion for summary judgment) is the 'Draft Index of Withheld Documents.'" Id. at 3.

It should be obvious from the docket record that the final lists are dated "December 27, 2013" because EPA produced them on that date. See ECF No. 35 (Dec. 27, 2013) (Notice of Filing). It should also be clear that EPA did not submit evidence explaining the circumstances under which it created the final lists because the agency produced them in response to this very Court's Minute Order. See Minute Order (Dec. 20, 2013). Despite CEI's strange nostalgia for the draft list of withheld documents, that list was inaccurate, as CEI itself pointed out in its Opposition. See Opp. at 21. By ordering EPA to submit a correct version of the final list, the Court had hoped (perhaps naively) to resolve the confusion and assuage some of CEI's concerns. Now that CEI has seen the list, the Court will not tarry here any longer.

C. Exemptions Claimed by EPA

Much of the dispute here centers on the propriety of EPA's claimed FOIA Exemptions. After considering CEI's threshold complaint regarding the language that EPA uses to justify its Exemptions, the Court serially examines the agency's invocations of Exemptions 4, 5, and 6.

1. *Boilerplate Exemption Explanations*

As an initial matter, CEI complains that EPA used boilerplate language when it explained how each relevant FOIA Exemption applied to the sampled withholdings. The group notes, for example, that EPA provided a word-for-word identical explanation for why Exemption 5 applied to several different documents that were withheld in full or withheld in part. See Opp. at 23 nn.

55 & 56. CEI objects to this copy/paste job, declaring that "[i]t is blackletter law that an agency cannot rely on 'boilerplate' privilege claims, or provide 'identical justifications' for withholding each of a series of withheld documents." Opp. at 22.

Despite CEI's apparent confidence, however, no such prohibition exists in the law of this circuit. On the contrary, the Court of Appeals has made clear that, "[e]specially where the agency has disclosed and withheld a large number of documents, . . . repetition provide[s] [an] efficient vehicle[] by which a court can review withholdings that implicate the same exemption for similar reasons." Judicial Watch, Inc. v. FDA, 449 F.3d 141, 147 (D.C. Cir. 2006). The alternative, after all, would force agencies to engage in "a sort of phony individualization (meaningless variations of language at each invocation of a specific exemption)." Keys v. DOJ, 830 F.2d 337, 349 (D.C. Cir. 1987). In short, "[n]o rule of law precludes [an agency] from treating common documents commonly." Judicial Watch, 449 F.3d at 147.

The main case that CEI cites in support of its argument, King v. DOJ, 830 F.2d 210 (D.C. Cir. 1987), dealt with a very different set of circumstances. There, DOJ used a "new method of presentation" to explain its withholdings, "depart[ing] from the practice of . . . separately describing each withheld document, and . . . submit[ing] instead copies of the documents released pursuant to [the plaintiff's] FOIA demand with each deletion annotated by means of a four-character code referring in turn to an accompanying code-catalogue." Id. at 219-20. The accompanying catalogue contained a list of generic statements keyed to the various code characters, so that by looking up the four-digit code annotating each deletion, the district court could find both a description of the material withheld and an explanation of the FOIA Exemption asserted. See id. at 220.

The D.C. Circuit rejected this new system, not only because it shifted the administrative burden of FOIA compliance from the agency to the court (never a good idea), but also because it contained "no contextual description for documents or substantial portions of documents withheld in their entirety." Id. at 221. In other words, because "a reproduction of the redacted documents can only show . . . the context from which an item has been deleted," and because "the coded commentary . . . [was] so general in nature as to be of little or no help," DOJ had not given the court enough information to "assess[] the character of the excised material and the grounds for its deletion." Id. The King court concluded: "Categorical description of redacted material coupled with categorical indication of anticipated consequences of disclosure is clearly inadequate." Id. (citing Dellums v. Powell, 642 F.2d 1351, 1360 n.29 (D.C. Cir. 1980)).

That is not the situation in this case. First, CEI does not claim, nor could it, that EPA's descriptions of its sampled withholdings are impermissibly vague or repetitive. Indeed, as EPA notes in its Reply, the Vaughn entries that CEI cites as examples of boilerplate exemption justifications also contain quite specific, and individualized, descriptions of the redacted information, see Reply at 11-12, sufficient for the Court to "assess[] the character of the excised material." King, 830 F.2d at 221. Second, while CEI has pointed out a great deal of duplication in EPA's justifications for its redactions, such repetition is permissible under the law of this circuit. See Judicial Watch, 449 F.3d at 147. In fact, King itself suggests the same, explaining that when the reasons for non-disclosure "are identical for several documents," the agency may provide "a single" justification, "accompanied by identifying references to the documents . . . at issue." King, 830 F.2d at 224.

In sum, EPA was allowed to use the same language to justify multiple different withholdings when the FOIA Exemptions applied for the same reasons. The Court will not deny EPA summary judgment on this basis.

### 2. *Exemption 4*

EPA says that it redacted one document under Exemption 4, which protects "trade secrets and commercial or financial information . . . [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). The agency's pleadings, however, do not indicate the identity or the content of the document withheld under this Exemption, nor do its sample Vaughn indices ever mention Exemption 4. In any event, because CEI has not raised any dispute as to the applicability of Exemption 4 to the mystery document in question, the Court believes it has conceded the issue and will thus grant summary judgment in favor of the agency on this point. See Hopkins v. Women's Div., Gen. Bd. of Global Ministries, 284 F. Supp. 2d 15, 25 (D.D.C. 2003).

### 3. *Exemption 5*

EPA withheld several thousand records in full and in part under Exemption 5, which protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 incorporates three traditional civil-discovery privileges: (1) the deliberative-process privilege; (2) the attorney-client privilege; and (3) the attorney work-product privilege. See Cuban v. SEC, 744 F. Supp. 2d 60, 75 (D.D.C. 2010).

EPA invoked all three privileges in its withholdings: 5,473 assertions of the deliberative-process privilege, see Wachter Decl., ¶ 18, 491 assertions of the attorney-client privilege, see id., ¶ 20, and 103 assertions of the attorney work-product privilege. See id., ¶ 22. Because CEI's Opposition does not challenge EPA's assertions of the latter two privileges, the Court will treat

the appropriateness of those as conceded, see Hopkins, 284 F. Supp. 2d at 25, and will address only EPA's invocations of the deliberative-process privilege.

This particular privilege is intended "to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 9 (2001) (internal quotation marks omitted). The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." Id.; see also Dow Jones & Co. v. DOJ, 917 F.2d 571, 573-74 (D.C. Cir. 1990). To fall under the protection of the deliberative-process privilege, withheld material must be both "predecisional" and "deliberative." Mapother v. DOJ, 3 F.3d 1533, 1537 (D.C. Cir. 1993). Material is "predecisional" if it was "generated before the adoption of an agency policy." Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980). It is "deliberative" if it "reflects the give-and-take of the consultative process." Id.

a. Scheduling Matters

In taking aim at a number of EPA's claimed withholdings under this privilege, CEI first challenges three documents that, it says, merely involved matters of scheduling. The first is a chain of 10 email messages between Administrator Jackson and her senior advisors "about the White House scheduling a call with various other federal agencies concerning legislation pending in the Senate." Mot., Exh. 6 (Vaughn Index – Every 100th) at 24. The second is a single email message from the Senior Policy Counsel to Jackson relating to "the expected schedule for a particular rulemaking." Id. at 31. The third is an email from the Associate Administrator for the Office of Congressional and Intergovernmental Affairs to Jackson regarding "potential upcoming travel plans and public events." Mot., Exh. 5 (Vaughn Index –

Every 10th) at 50.  CEI argues that scheduling matters such as these are not "deliberative" and so are not covered by the privilege.

Such an argument sweeps too broadly.  "The deliberative character of agency documents can often be determined through the simple test that factual material must be disclosed but advice and recommendations may be withheld."  Mapother, 3 F.3d at 1537 (internal quotation marks omitted).  This fact/opinion distinction applies to scheduling matters just as it does to any other aspect of the agency's deliberative process: in the ordinary case, factual scheduling material must be disclosed and advice about scheduling may be withheld.  While it is true, therefore, that courts have previously ordered disclosure of "proposed work schedule[s]." Elkem Metals Co. v. United States, 24 C.I.T. 1395, 1402 (C.I.T. 2000), and "scheduling requests," Judicial Watch, Inc. v. Comm'n on U.S.-Pacific Trade and Inv. Policy, No. 97-0099, 1999 WL 33944413, *6 (D.D.C. Sept. 30, 1999), those cases involved documents primarily containing factual material – "filing and scheduling dates" – which "d[id] not reflect the give-and-take" of the agencies' decisionmaking processes.  Elkem Metals, 24 C.I.T. at 1402.  Here, by contrast, the documents at issue "involved decisions about whether to hold, and who to send to, meetings on topics of pending legislation, rulemakings, and other discussions."  Reply at 17.  These materials, then, fell on the "advice and recommendations" side of the line, Mapother, 3 F.3d at 1537, and were appropriately withheld under the deliberative-process privilege.

### b.   Media Coverage

CEI also objects to EPA's withholding of communications regarding media coverage of the agency's actions – debates over whether to accept certain interview requests, discussions of media reports, and so on.  According to CEI, agency communications related to media coverage "are not protected by Exemption 5 when they pertain primarily to past developments or agency

actions, rather than to developing agency policies," because Exemption 5 protects "discussion of policy, not PR."  Opp. at 29.

The precedent, unsurprisingly, does not support such a broad position.  In past cases, Exemption 5 has indeed been found to cover agency deliberations about how to respond to media inquiries regarding prior agency actions, see Judicial Watch, Inc. v. Dep't of Homeland Sec., 736 F. Supp. 2d 202, 208 (D.D.C. 2010), as well as discussions about press coverage of existing agency policies, see Citizens for Responsibility and Ethics in Washington v. Dep't of Labor, 478 F. Supp. 2d 77, 83 (D.D.C. 2007), and suggested talking points about how to answer questions regarding the duties assigned to agency employees.  See Judicial Watch, Inc. v. Dep't of Commerce, 337 F. Supp. 2d 146, 174 (D.D.C. 2004).  These deliberations are considered "predecisional" so long as they were "generated as part of a continuous process of agency decision making, viz., how to respond to on-going inquiries."  Judicial Watch, 736 F.3d, at 208; see also Judicial Watch v. Dep't of the Treasury, 796 F. Supp. 2d 13, 31 (D.D.C. 2011) ("Post-decisional documents properly fall under the deliberative process privilege when they recount or reflect pre-decisional deliberations.").

Here, the two media-related withholdings to which CEI objects reflected EPA's ongoing decisionmaking about "how the agency's activities should be described to the general public," Nat'l Sec. Archive v. FBI, No. 88-1507, 1993 WL 128499, at *2 (D.D.C. Apr. 15, 1993), and so they appropriately fall under the protection of Exemption 5.  See Vaughn Index – Every 10th at 1 (document withheld that "discuss[ed] the outcome of a call with the White House Press office related to an interview request from a New York Times reporter" and "reflect[ed] the decisionmaking process related to whether to accept the interview request, and how and when to communicate with the public about developing [a]gency actions"); id. at 19 (document withheld

that "relate[d] to [officials'] scheduling and availability for several EPA events" and "reflect[ed] the advice and deliberations of EPA's management in formulating a decision about public representation of the [a]gency").

CEI also notes, correctly, that EPA must identify a "definable decisionmaking process" to which withheld documents contributed in order to invoke the deliberative-process privilege. See Opp. at 34 (citing Access Reports v. DOJ, 926 F.2d 1192, 1196 (D.C. Cir. 1991)). But the group nowhere specifically challenges any of the withholdings listed in EPA's sample Vaughn indices for failure to comply with this rule. Instead, the only specific challenge that CEI offers is that EPA withheld material "without explaining how producing the communication would reveal any deliberations about developing agency policies," citing EPA's redaction of a chain of emails related to an interview request from a journalist. Opp. at 28-29 (citing Vaughn Index – Every 100th at 11). The index entry for that withholding, however, contains precisely such an explanation:

> Document EPA-2243 contains an internal email chain, among staff in the Office of External Affairs and Environmental Education, the Director of Operations, and Administrator Lisa Jackson discussing the an [sic] interview request from a US News and World Report reporter. Internal portions of the e-mail discussing the request, including recommended options and approaches, have been withheld. . . . The withheld information is protected under Exemption 5's deliberative process privilege because it is an internal conversation which reflects the analyses, advice, and deliberations of EPA's management when deliberating about official public responses. These communications were predecisional because they reflect the decisionmaking process related to whether to accept the interview request, and how and when to communicate with the public about developing Agency actions. The email string represents staff opinions and judgments that were under consideration by EPA. Release would have a chilling effect on the Agency's ability to have open and frank discussions among its staff and may harm the Agency's decisionmaking by chilling the open discussion of issues and approaches to communicating with the press, and the ability to

> coordinate with the White House. Furthermore, release could
> cause public confusion by disclosure of reasons, rationales, and
> conclusions that were not in fact ultimately the position of the EPA
> or the U.S. Government.

Vaughn Index – Every 100th at 11.

CEI never says why this justification should fail to satisfy the agency's obligations under FOIA, and, indeed, the Court finds that it is sufficient to support the redaction. CEI also annotates this bit of its brief with several lengthy footnotes comprised of string cites to the sample Vaughn indices, presumably in an attempt to suggest that additional Vaughn entries may also have failed to describe a connection with agency policy. See Opp. at 27-28 nn.73, 74, 75. As these footnotes are bare citations unaccompanied by any explanation, they provide no argument for the Court to address.

c.  Interactions with Congress

CEI next challenges EPA's withholding of several communications related to the agency's interactions with Congress. The group argues that an agency's communications in response to Congressional queries are not protected when they "reflect decisions that had already been made," and claims that EPA "does not show the communications about Congressional hearings it withheld or redacted in its sample Vaughn index went beyond such run-of-the-mill unprivileged communications." Opp. at 30-31 (internal quotation marks omitted). CEI, once again, annotates this bald assertion with several extended footnote references otherwise lacking in explanation. See id. at 31 nn.84-85.

To the extent that the Court can discern an argument here, however, it seems belied by the very Vaughn entries that CEI cites, which make clear that the withheld materials preceded decisions about whether and how to respond to phone calls from individual Senators and how best to handle testimony before Congress. See Vaughn Index – Every 10th at 12 (withheld

document "relat[ed] to a proposed call to the Administrator from Senator Diane [*sic*] Feinstein . .

. [;] [t]he information and advice provided were predecisional because they reflect the

decisionmaking process related to whether to accept the call, and how to prepare for potential

points of debate or discussion"); <u>id.</u> at 20-21 (withheld document "related to proposed upcoming

meeting with Senator Jack Reed . . . [;] [t]he information and advice provided were predecisional

because they reflect the decisionmaking process related to planning for the meeting, and how to

prepare for potential points of debate or discussion"); <u>Vaughn</u> Index – Every 100th at 15

(redacted document "contain[ed] three messages related to testimony in a hearing . . . [;] it is part

of an internal conversation reflecting the commentary of an EPA senior official").

CEI specifically attacks EPA's withholding of three Congress-related communications.

First, it claims that EPA's redaction of an email chain between several senior staff and

Administrator Jackson concerning testimony in a Congressional hearing, which EPA described

as "part of an internal conversation reflecting the commentary of an EPA senior official,"

<u>Vaughn</u> Index – Every 100th at 15, was not protected "absent a direct connection to actual policy

formulation by the agency." Opp. at 31 (internal quotation marks omitted). The Supreme Court

has made clear, however, that the deliberative-process privilege does not "turn[] on the ability of

an agency to identify a specific decision in connection with which a memorandum is prepared.

Agencies are, and properly should be, engaged in a continuing process of examining their

policies; this process will generate memoranda containing recommendations which do not ripen

into agency decisions." <u>NLRB v. Sears, Roebuck & Co.</u>, 421 U.S. 132, 151 n.18 (1975). EPA

did not have to provide the specifics that CEI seeks.

CEI makes a similar argument with respect to EPA's withholding of a document authored

by a Deputy Associate Administrator for legislative affairs, which contained "information and

advice regarding issues related to [a] proposed upcoming meeting with Senator Jack Reed." Vaughn Index – Every 10th at 20. CEI claims that this document could not be withheld under the deliberative-process privilege because it was not sufficiently tied to the development of agency policies, citing a decision that the group claims stands for the proposition that "briefing papers [are] not protected." Opp. at 32 (citing Nat'l Sec. Archive, 1993 WL 128499, at *2-3). CEI's citation, however, reflects a misreading of that case, in which the court ordered disclosure of papers used by an agency official to prepare for testifying before Congress because their "focus was upon reporting facts, not weighing policies." Nat'l Sec. Archive, 1993 WL 128499, at *2 (internal quotation marks omitted). That is not the situation here, since the communication at issue involved "how to communicate with members of Congress . . . and how to prepare for potential points of debate or discussion." Vaughn Index – Every 10th at 20-21 (emphasis added). The challenged redaction was therefore proper. Cf. Judicial Watch, 736 F. Supp. 2d at 208 (deliberative-process privilege covers agency emails involving recommendations and evaluations for how to respond to Congressional requests for information).

CEI also challenges EPA's withholding of an email to Administrator Jackson from the Associate Administrator for the Office of Congressional and Intergovernmental Affairs, related to a proposed phone call from Senator Dianne Feinstein. See Vaughn Index – Every 10th at 12. CEI describes the email as merely a discussion of "whether to accept the call," and therefore too peripheral to actual policy formulation to justify exemption. Opp. at 31-32. That characterization of the document is hardly fair, since the Vaughn entry also states that "[t]he information and advice provided" in the document "related to . . . how to prepare for potential points of debate or discussion." Vaughn Index – Every 10th at 12. That more substantive

discussion was not "peripheral" to agency policy and was appropriately withheld.  Cf. Judicial Watch, 736 F. Supp. 2d at 208.

### d. Past Events

CEI also complains that EPA fully withheld documents that pertained in part to past events, rather than developing policies.  Once again, however, CEI fails to tie its argument to any specific entry in the agency's sample Vaughn index.  Instead, the group simply punctuates each clause in this section of its brief with a footnote containing a list of citations, see Opp. at 32 nn.89-91, apparently inviting the Court to do the hard work of figuring out how each of the cited Vaughn entries might have violated the principle of law at issue.  To the extent the Court can decipher an argument from the meager substantive content in CEI's footnotes, the group seems to object to EPA's withholding of a draft document relating to the development of public statements to commemorate the agency's 40th anniversary, see Vaughn Index – Every 10th at 8, perhaps because the founding of the agency was a past event.  That argument, if it is the one CEI intended, is difficult to take seriously.  Deliberations over how to commemorate a past event are obviously "predecisional" to the actual commemoration – they bear little, if at all, on the event itself, especially if the event took place four decades prior to the discussion.

### e. Final Objections

CEI offers two last points.  First, it expresses doubt about the "predecisional" nature of several of the EPA's withheld documents.  But the group makes absolutely no substantive argument as to why the Court should not consider those documents predecisional and thus unprotected under the deliberative-process privilege.  Instead, it simply observes that "EPA withheld a remarkable variety of information as 'pre-decisional'" and then proceeds to list them.

Opp. at 26-27. Where Plaintiff has failed to argue its case, the Court cannot do the group's job for it.

In addition, CEI calls the Court's attention to what it says were improper withholdings and redactions of documents other than those listed in the sample <u>Vaughn</u> indices. <u>See</u> Opp. at 37 nn.98-99. Such an argument ignores why the Court ordered sampling in the first place. This case involved well over 5,000 documents that were either withheld or redacted. The whole point of representative sampling is "to reduce a voluminous FOIA exemption case to a manageable number of items that can be evaluated individually," in recognition of "the limitations of time and resources that constrain agencies, courts, and FOIA requesters alike." <u>Bonner</u>, 928 F.2d at 1151; <u>see also</u> <u>Meeropol</u>, 790 F.2d at 958; <u>Weisberg</u>, 745 F.2d at 1490. Once the agency describes and justifies its sampled withholdings, the Court "extrapolate[s] its conclusions from the representative sample to the larger group." <u>Bonner</u>, 928 F.2d at 1151 (internal quotation marks omitted). An attack on withholdings outside the sample, which EPA has not had the chance either to describe or to explain, is therefore outside the scope of the Court's review.

### 4. *Exemption 6*

EPA withheld information 2,695 times under FOIA Exemption 6, <u>see</u> Wachter Decl., ¶ 24, which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The statute's reference to "similar files" is key; indeed, the Supreme Court has made clear that the applicability of Exemption 6 "was not intended to turn upon the label of the file" in question, and that it "cover[s] detailed [g]overnment records on an individual which can be identified as applying to that individual." <u>Dep't of State v. Washington Post Co.</u>, 456 U.S. 595, 601-02 (1982). Whether disclosure of a covered record would constitute "a clearly unwarranted

invasion of personal privacy" depends on balancing the "individual's right of privacy" against "the public's right to government information." Dep't of the Air Force v. Rose, 425 U.S. 352, 371-72 (1976); see also NARA v. Favish, 541 U.S. 157, 172 (2004).

To begin, CEI directs several of its objections to documents outside the sample Vaughn indices submitted with EPA's Motion. According to CEI, EPA must justify dozens of redactions in unsampled documents by showing that the private interest in each redaction outweighs the public's interest in disclosure. See Opp. at 38 & nn.100-02; see id. at 41-42 & n.110. The Court, however, again reminds Plaintiff that the entire point of the sampling procedure was to limit to a reasonable number the withholdings that EPA needed to explain and defend. See Bonner, 928 F.2d at 1151. The Court, therefore, will not consider these objections.

Turning to the sample Vaughn indices actually at issue here, CEI complains that EPA redacted the personal, non-official email addresses of EPA employees who sent or received work-related emails using their private email accounts. See, e.g., Vaughn Index – Every 10th at 31-32, 38, 51. CEI argues that these employees have no private interest in their personal email addresses because the use of personal email accounts for work-related correspondence violates EPA policy. CEI cites no authority for this proposition, and the Court does not see why an agency official's personal email address – in which he or she would obviously have a powerful privacy interest – would become any less private by dint of the fact that it was used when it should not have been.

More persuasive is CEI's argument that there is a strong public interest in these addresses, both because future FOIA requesters may seek access to the employees' non-official email accounts and because the use of those accounts may have violated agency policy. On the first point, however, the Court does not believe that FOIA requesters will be impeded without

disclosure of the employees' actual email addresses, since they can simply ask for work-related emails and agency records found in the specific employees' personal accounts; requesters need not spell out the email addresses themselves. On the second point, the Court does not see any additional value in releasing the private email addresses used by EPA employees. The public interest in exposing potential violations of agency policy has already been satisfied by the Vaughn entries in question, which both name the employee and explain that his or her "personal email address . . . [has been] withheld on the basis of Exemption 6." E.g., Vaughn Index – Every 10th at 51-52. Beyond that, there is no public interest in knowing, for example, whether EPA employees used Hotmail or Yahoo for their personal email correspondence.

Finally, CEI challenges two instances where EPA withheld the email address of former EPA Administrator and White House advisor Carol Browner. See Vaughn Index – Every 100th at 21, 26-27. In one case, the Vaughn entry makes clear that the agency redacted Browner's "White House email address" in order to "avoid potential unsolicited communications." Id. at 26-27. According to CEI, however, because Browner has left her position at the White House, EPA has no reason to redact her presumably inactive work email address. In the second instance, the Vaughn entry in question does not specify whether the redacted email address was Browner's personal email account or her official account. See Vaughn Index – Every 100th at 21 ("The only information withheld [is] . . . the email address[] of Carol Browner.").

This is a close question. It is clear that White House staff have a powerful privacy interest in their work email addresses while they are employed, see Shurtleff v. EPA, No. 10-2030, 2013 WL 5423963, at *10-11 (D.D.C. Sept. 30, 2013), but it is less certain whether much interest remains after they have left the government. At the same time, although the public interest in the specific spelling of an inactive address might seem minor, this entire case began

because an EPA official was using an alternative work email address under a previously unknown alias. There is a public interest, therefore, in knowing whether Browner used her personal or official email address to communicate with EPA and whether the official email address she used reflected her real name or an alias, both for the sake of future FOIA requesters and for those curious about White House compliance with federal record-keeping laws.

The balance, in the end, weighs in favor of disclosure. As for the first entry – number 5530 – EPA must disclose the White House email address that Browner used to communicate with EPA. As for the second – number 4860 – EPA must clarify whether it withheld Browner's personal or official email address. If it is the former, EPA need not say more, since, as explained above, Browner has a powerful privacy interest in her own personal email address. If it is the latter, then EPA must release the email address itself, since there is a public interest in knowing whether Browner was using an official account under her own name or under an alias.

D. Segregability

The last issue that the Court must address is segregability. FOIA requires that "[a]ny reasonably segregable portion of a record . . . be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Accordingly, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Mead Data Central, Inc. v. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977). Still, an agency is not obligated to segregate non-exempt material if "the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value." Neufeld v. IRS, 646 F.2d 661, 666 (D.C. Cir. 1981), overruled on other grounds by Church of Scientology of California v. IRS, 792 F.2d 153 (D.C. Cir. 1986).

While the Government is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material," Hodge v. FBI, 703 F.3d 575, 582 (D.C. Cir. 2013), this presumption of compliance does not obviate its obligation to carry its evidentiary burden and fully explain its decisions on segregability. See Mead Data Cent., 566 F.2d at 261. The agency must provide "a detailed justification and not just conclusory statements to demonstrate that all reasonably segregable information has been released." Valfells v. CIA, 717 F. Supp. 2d 110, 120 (D.D.C. 2010) (internal quotation marks omitted); see also Armstrong v. Exec. Office of the President, 97 F.3d 575, 578 (D.C. Cir. 1996) (determining Government affidavits explained nonsegregability of documents with "reasonable specificity"). "In making a determination as to segregability . . . a district court judge 'may examine the contents of . . . agency records *in camera*' . . . . This Circuit has interpreted this language to give district court judges broad discretion in determining whether *in camera* review is appropriate." Id. at 577-78 (citations omitted).

CEI complains that EPA's segregability analysis for each entry in the sample Vaughn index of fully withheld documents is insufficiently thorough or specific. The group observes that many of EPA's explanations for why it could not segregate discloseable information in these records appear boilerplate, repeating again and again:

> The withheld information does not contain reasonably segregable factual information. To the extent any of the withheld information contains facts, the facts reflect Agency deliberations. The selection of those facts was an integral part of the deliberations, and the factual information contained therein is inextricably intertwined with the deliberative discussion concerning this document.

E.g., Vaughn Index – Every 10th at 1, 2, 4, 5, 6, 7, 8, 9, 10, 12. CEI argues that "a blanket declaration that all facts are so intertwined to prevent disclosure . . . does not constitute a

sufficient explanation of non-segregability . . . [;] for <u>each</u> entry the defendant is required to 'specify in detail which portions of the document are disclosable and which are allegedly exempt.'" Opp. at 34 (quoting <u>Defenders of Wildlife v. U.S. Border Patrol</u>, 623 F. Supp. 2d 83, 90 (D.D.C. 2009)).

In order to ensure that EPA complied with its disclosure obligations and properly segregated all non-exempt information, the Court ordered the agency to "produce *in camera* every tenth document listed on the sample <u>Vaughn</u> index of fully withheld documents." Minute Order (Jan. 10, 2014). Perhaps because it misunderstood the Order, or perhaps in a fit of generosity, EPA instead provided the Court with <u>all</u> of the documents listed on the sample <u>Vaughn</u> index of fully withheld documents. <u>See</u> ECF No. 37 (Notice of *In Camera*, *Ex Parte* Submission). The Court has reviewed these records. It has also considered the assurances of Wachter, whose Declaration maintains that "EPA performed a document-by-document and line-by-line review of documents for any reasonable segregable information," and that "[t]here is no additional segregable factual information that could be released without revealing protected information." Wachter Decl., ¶ 28.

Having done so, the Court is satisfied that there are no segregability problems in this case. If the fully withheld documents had instead been redacted, CEI would have only found "disjointed words, phrases, or . . . sentences which taken separately or together have minimal or no information content." <u>Mead Data</u>, 566 F.2d at 261 n.55. Coupled with the evident good faith in which EPA undertook its segregation of non-exempt material – nearly 80% of the documents withheld were redacted, rather than withheld in full, <u>see</u> Reply at 15 n.5 – the Court finds that despite EPA's rather generic segregability analyses, the agency has demonstrated that all reasonably segregable information has been released. <u>See</u> <u>Acosta v. FBI</u>, 946 F. Supp. 2d 53, 59

(D.D.C. 2013) ("Although some of [the agency's segregability analysis] may appear generic, having reviewed the redacted documents and the Hardy Declaration, the Court finds that no segregability problem exists here."); cf. Armstrong, 97 F.3d at 577-78 ("Summary judgment may not be appropriate without *in camera* review when agency affidavits in support of a claim of exemption are insufficiently detailed or there is evidence of bad faith on the part of the agency.") (emphasis added). The Court will therefore grant EPA summary judgment on this point.

## IV. Conclusion

For the foregoing reasons, the Court will grant in part and deny in part EPA's Motion for Summary Judgment. Summary judgment will be entered in favor of EPA on all counts, save for (1) EPA shall justify its withholding – *i.e.*, produce a separate Vaughn entry – of the 10th unnumbered document listed in footnote 47 of CEI's Opposition brief (counting from the left), see Opp. at 19 n.47; (2) EPA shall disclose the official email address Browner used to communicate with EPA in Vaughn entry number 5530, see Vaughn Index – Every 100th at 26-27; and (3) EPA shall disclose whether the redaction in Vaughn entry number 4860 withheld Browner's personal or official email address. See Vaughn Index – Every 100th at 21. If it is the latter, EPA must disclose that email address. A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: January 29, 2014